Civil Procedure, direct a trial by a jury of the material questions of fact arising upon the issues between the parties. In re Laudy's Will, 148 N. Y. 403, 42 N. E. 1061.

An order will be allowed directing a trial at a trial term in Jefferson county of questions arising in the case, to wit: (1) Was the instrument purporting to be the last will and testament of David Drake, dated March 16, 1896, duly executed by him? (2) Did he have testamentary capacity at the time of the execution of the instrument purporting to be his will? (3) Was the execution of the will of the decedent of March, 1896, procured by fraud, circumvention, or undue influence practiced upon him?

We think the costs of the appeal should abide the event of a new trial, and be payable out of the estate. In re Van Houten's Will, 11 App. Div. 211, 42 N. Y. Supp. 919; In re Dixon's Will, 42 App. Div. 489, 59 N. Y. Supp. 421.

So much of the decree of the surrogate's court of Jefferson county as is appealed from is reversed, and a trial of the questions stated in the opinion ordered before a jury at a trial term in that county, with the costs of this appeal to the appellants, to abide the event of a new trial, payable out of the estate. All concur.

---

MARTINDALE v. WESTERN N. Y. & P. RY. CO.

(Supreme Court, Appellate Division, Fourth Department. November 22, 1899.)

1. BONA FIDE PURCHASER—UNRECORDED INCUMBRANCES.

A railroad running under a lease along an abandoned canal cut a spillway in the bank to permit overflows to pass into a state ditch, which for 50 years had been the channel of a creek. The ditch had become filled with débris, and the water turned into it damaged the crops of a neighboring landowner. The company contracted with such landowner to keep the ditch clear, which contract was not recorded. There was nothing in the legislative act authorizing the sale of the canal to the railroad, nor in the conveyance, nor on the land, to indicate that the running of the water through the spillway imposed on the company the burden of clearing the ditch. *Held*, that the contract could not be specifically enforced against an innocent purchaser of the railroad.

2. MORTGAGES—FORECLOSURE—EFFECT.

In any event, the land of the contracting company being mortgaged at the time of the contract, the latter was cut off by the decree of foreclosure, the mortgagee and purchaser under the sale having no notice of it; and this though the other party to the contract was not a party to the foreclosure.

Appeal from equity term, Livingston county.

Suit by Catharine J. Martindale, as administratrix with the will annexed of Charles Jones, deceased, against the Western New York & Pennsylvania Railway Company. There was a decree for plaintiff, and defendant appeals. Reversed.

This action was commenced February 16, 1897, to enforce specifically an agreement entered into between the Western New York & Pennsylvania Railroad Company, a predecessor in title of the defendant, and the plaintiff's testator, by whom the action was originally brought. The following is a copy of the agreement, except the acknowledgments thereon:

"This agreement, made this first day of May, in the year of our Lord one thousand eight hundred and eighty-eight, between the Western New York and Pennsylvania Railroad Company, a corporation duly existing and organized under the laws of the states of New York and Pennsylvania, of the first part, and Charles Jones, of Geneseo, Livingston county, New York, of the second part, witnesseth: That the parties hereto, in consideration of the mutual covenants and agreements hereinafter expressed, and the sum of one dollar, by each to the other in hand paid, receipt whereof is hereby acknowledged, have agreed and do hereby agree as follows: First. The party of the first part agrees to clear out and maintain the state channel, from the spillway as now built on the abandoned Genesee Valley Canal, near to and adjoining the lands of the party of the second part, in the town of Leicester, Livingston county, N. Y., just north of said spillway to Baird's creek. Second. The party of the first part also agrees to keep up and maintain a channel in the bed of said abandoned canal from said spillway to Baird's creek. Third. It is mutually understood and agreed that the elevation of the top of said spillway shall be maintained at its present elevation, being the elevation agreed upon by said party of the second part and E. A. Fisher, Esq., the engineer of the party of the first part. Fourth. The party of the first part also agrees to keep and maintain on top of said spillway flash boards twelve inches in height, to be removed only in case of extreme high water. Fifth. The party of the second part agrees that the party of the first part may put in, keep, and maintain a spillway of the height aforesaid, and of such length as the party of the first part may deem necessary, and during times of high water may allow the water to flow freely over said spillway. The party of the second part, for himself, his heirs, executors, administrators, and assigns, hereby releases the party of the first part, its successors and assigns, of and from all damages, claim for damages, cause of action, and liability by reason of the flowing of the lands of the party of the second part by reason of the use as aforesaid of said spillway in times of high water, or for any claim heretofore existing. In witness whereof, the party of the first part has caused its corporate seal to be hereunto affixed, duly attested, and these presents to be assigned by its president, and the party of the second part has hereunto set his hand and seal the day and year first above written.

"[Seal.]        Western New York and Pennsylvania Railroad Company,
                        "By C. H. Allen, President.

"Attest:
    "J. R. Trimble, Secretary.
            "Chas. Jones.  [Seal.]"

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and SMITH, JJ.

Charles J. Bissell, for appellant.
J. B. Adams, for respondent.

SPRING, J.   The Genesee Valley Canal, which was constructed in pursuance of chapter 257 of the Laws of 1836, extended from the city of Rochester to Mill Grove, in the county of Cattaraugus, passing through the town of Leicester, in the county of Livingston.  At the time of its construction, two creeks in that town were diverted from their respective channels, and made to run together under the prism or bed of the canal, entering an artificial ditch known as the "State Ditch," and, following this, entered into Baird's creek.  This state ditch was constructed for some distance parallel with the canal, and then diverging therefrom in a northeasterly direction through the farm now owned by one Dailey, and lying adjacent to the canal, and on through the farm of the original plaintiff in this action, and then through the lands of still another proprietor, before reaching the creek with which it was connected.

From the early, construction of the canal until its final abandonment this state ditch received the waters of these two creeks, and for all practical purposes for more than a generation constituted the bed of these two streams after their confluence. There was apparently no specific, statutory duty imposed upon the state during its control of this ditch to keep it clean of silt and sediment. Of course, if it had filled up so that the waters flowed upon the lands of farmers, undoubtedly they could have presented claims to the state for the damages sustained, and, if such overflowage was tantamount to a nuisance, they could have caused its abatement. In 1860 an appropriation was made for the purpose of cleaning out this ditch and Baird's creek as well, which, passing along a comparatively level country at this place, had also become filled with sediment. The creek and ditch were both then cleaned out by the state, and this seems to be the only time the state intervened to clean the creeks. By chapter 404 of the Laws of 1877 the state abandoned this canal, and directed its sale, with its appurtenances, feeders, and water privileges, with certain restrictions set forth in the act. Section 10 of the act required those in charge of the canal to restore the streams which had been diverted to their natural channels. Under the direction of the local superintendent in charge of the division including this ditch, the plaintiff cut a channel through the embankment of this canal, permitting the waters of Samp's creek, which was one of those running into the ditch, to flow into the prism of the canal, uniting with Baird's creek where it crossed the canal. The waters of the canal under the state management passed over the latter creek by means of an aqueduct, which was removed by Jones, the original plaintiff, so that the waters, after emptying into the bed of the canal, readily reached the creek. This diversion of the waters, although done under the direction of an officer of the state, and in violation of the section referred to, was in reality for the benefit of Jones, as the state ditch was then badly congested with dirt and sediment, causing the waters to overflow his farm, inflicting damage to his crops. By section 2, c. 326, of the Laws of 1880, the state commissioners of the land office were directed to sell and convey this canal property "to any corporation or company," to operate and maintain a railroad along the line of said canal. In pursuance of this authority, in 1880, the Genesee Valley Railroad Company became the owner of this land by purchase from the state, and subsequently the Western New York & Pennsylvania Railroad Company became vested with the title thereto by a lease running for 999 years, and operated its railroad during its ownership. When that company acquired its title, the water of Samp's creek was flowing into the prism of the abandoned canal through the channel cut by the plaintiff. In times of high water the force of this stream washed out the railroad company's embankment, and, in order to oviate this recurring difficulty, it caused a spillway to be cut through the canal bank to the old state ditch at the same place where the waters during the state régime passed under the canal bed. This was in 1887, and the plaintiff, Jones, claimed this accession to the ditch, filled up

as it was with sediment and débris, caused the water to overflow his farm, and destroy his crops. With matters in this situation, the agreement recited in the statement of facts was entered into. This agreement was never recorded, and subsequently the defendant became the purchaser and owner of this railroad property, without any notice of its existence, and without any information as to any liability resting upon it to maintain this spillway, or to keep clean the ditch through which the water flowed. The contention of the plaintiffs is that the covenant of the agreement imposing the burden upon the railroad company contracting with Jones to clean out the state channel from the spillway to Baird's creek and the prism of the canal, and to maintain on the top of the spillway flashboards 12 inches high, is a covenant running with the land. We do not deem it necessary to enter into the mass of technical learning which is based upon this question and has been so elaborately discussed by the respective counsel, for there are other questions decisive of this case. As far as I have been able to discover, the covenants which have been held as sticking to the land perpetually, have been where the assignees or heirs at law knew, by actual notice or constructively, that there was a burden or duty inseparably connected with the estate. If an easement exists, it is either found in the deed or is actually observable upon the land itself. In this case there was nothing to indicate to a purchaser that the running of the water through this spillway imposed any burden upon the railroad company operating the road. The land was not fettered by any such burden in any conveyance carrying along the title. There was nothing in the legislation authorizing its sale imposing any such duty upon the grantee of the estate, and the personal contract between the original plaintiff and the predecessor of the defendant was not recorded. Assuming, therefore, for the purpose of this argument, that this was a covenant running with the land, the plaintiff, by his own remissness in failing to cause to be recorded the instrument by which the grant was created, has debarred herself from asserting it against the defendant, who was an innocent purchaser without notice. It is contended, however, by the plaintiff that, irrespective of any question as to the nature of the covenant itself, equity will enforce this agreement against the existing owner. That is true, providing the defendant knew of the provision of the agreement, and with that knowledge recognized its validity by using the spillway. That is, the defendant, upon learning that the use of this sluice was dependent upon a certain contract, and specific obligations accompanied such user, could not avail himself of the benefits without performing the corresponding covenants. There is nothing tending to show that the defendant had actual notice of this agreement. The fact of the existence of the spillway gave no intimation of any duty to clean out the ditch. The spillway was where the channel of the creek had been for over 50 years, and, for aught that appears in the lay of the land, was its natural course. In Trustees v. Lynch, 70 N. Y. 440, and Pom. Eq. Jur. § 1295, cited by counsel for the respondent, and in all the cases I have been able to examine, the basis of the enforcement of a covenant

of this kind by a court of equity is that the person sought to be charged has had notice, actual or constructive, of such covenant. That must, of necessity, be so, for a person could not be burdened by a court of equity with the performance of a contract containing covenants of which he knew nothing. If this is an easement attached to the lands of the defendant, it must be informed of this servitude, either by its character, by actual notice, or by the record of the fact which gave life to the burden. If this were an easement perpetually attached to the land, the instrument creating it was a grant conveying an estate of land of the same effect as any other conveyance. Nellis v. Munson, 108 N. Y. 453, 15 N. E. 739. And the failure to record such instrument would deprive the plaintiff of the benefit of the easement, the same as though it were any other incumbrance upon the lands of the defendant.

Independently of the nature and effect of this contract, I seriously question on another ground the right of the plaintiff to maintain this suit in equity for the specific performance of this agreement. At the time of the execution of the contract, all the land of the railroad company was incumbered by a mortgage. This was subsequently foreclosed, and a decree of sale entered, and a master in chancery was directed to sell the said premises in pursuance of the judgment, and the present owner derived title through this decree of sale. Inasmuch as the mortgagee and the purchaser alike were ignorant of this agreement, and there was nothing upon which constructive notice hinged, the purchaser and his grantees should be absolved from the performance of this obligation as a perpetual covenant. It was cut off by the decree or judgment like any other incumbrance. The fact that Jones was not a party to the foreclosure does not preserve his rights, as the mortgagee had no notice of his claim. That the plaintiffs can maintain an action at law for any damage inflicted upon this farm by the wrongful acts of the defendant in overflowing his land with water from this ditch, is obvious. That a suit in equity to avoid a multiplicity of actions can be sustained is probably true. This action, however, is pure and simple to enforce specifically the contract in question, and the decision made conformed strictly to the relief sought, and we cannot uphold this judgment merely because the plaintiffs may maintain some other action. The judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

Judgment reversed, and new trial ordered, with costs to the appellant to abide the event. All concur.